# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEVEN MICHAEL TIELSCH,   )
     )    Civil Action No. 16 – 594
     Petitioner,   )
     )
     v.   )    Magistrate Judge Lisa Pupo Lenihan
     )
MARK CAPOZZA, THE   )
ATTORNEY GENERAL OF THE   )
STATE OF PENNSYLVANIA and   )
THE DISTRICT ATTORNEY OF   )
ALLEGHENY COUNTY,   )
     )
     Respondents.   )

## MEMORANDUM OPINION

Pending before the Court is a Petition for Writ of Habeas Corpus ("Habeas Petition") filed by Petitioner Steven Michael Tielsch ("Petitioner" or "Tielsch") pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Petitioner challenges his judgment of conviction for third-degree murder and his sentence of ten to twenty years imprisonment entered by the Court of Common Pleas of Allegheny County on November 13, 2002.[1] For the following reasons, the Petition and Petitioner's request for an evidentiary hearing will be denied. A certificate of appealability will also be denied.

## A.  Factual and Procedural Background

On April 17, 1986, Tielsch and Kevin Ohm were driving around the Squirrel Hill section of Pittsburgh in a black Corvette. At approximately 9:15 p.m., the victim, Neil S. Rosenbaum, a rabbinical student from Canada, was

---

[1] Petitioner was granted parole after he filed his Habeas Petition. *See* ECF No. 38.

walking toward the intersection of Phillips and Pittcock Avenues when Tielsch and Ohm pulled up in the Corvette. The pair asked the victim for directions. As the victim approached the vehicle, Tielsch opened fire and shot the victim four to five times. Immediately after the shooting, Tielsch and Ohm drove off. Shortly thereafter, before he passed away, the victim told Officer Albert Stegena that a black Corvette had pulled up to him and that two white males had been in the vehicle.

The victim had bullet wounds to his chest, right elbow, right buttock, left buttock, and right wrist. Leon Rozin, M.D., the chief of forensic pathologist for Allegheny County, testified that it was possible that the bullet which entered the victim's chest also caused the wound to the elbow. See N.T., Trial 4, 9/4/02, at 218-219.

Although an intensive investigation took place, little was learned as to the killer's identify until early 1988 when representatives from the District Attorney's Office and the local police department met with Sanford Gordon. Gordon told the police that Tielsch had bragged about the killing while the two had been housed at the Allegheny County Jail.

Additional evidence came to the Commonwealth's attention through Michael Starr. While Starr was under federal indictment, he related to the authorities that he was involved in an incident in the summer of 1991. Starr had been at a nightclub in the Strip District of Pittsburgh when he got into an altercation with Tielsch. According to Starr, Tielsch eventually pulled his jacket to the side and exposed the butt of a gun to Starr, and said: "I wacked some Jew f—k and I would have no trouble doing you too."

Tielsch was subsequently arrested for the victim's murder on February 17, 2000. On January 23, 2001, the first jury trial commenced. On February 13, 2001, the jury informed the trial court that it was hopelessly deadlocked; a mistrial was eventually declared. On November 26, 2001, the second jury trial began, but again the result was a mistrial due to a deadlocked jury. On May 13, 2002, the third jury trial began, but once again, the jury informed the trial court that it was deadlocked without hope for a unanimous verdict.

As stated above, this appeal is a result of the fourth jury trial, which began on August 27, 2002, and ended on September 13, 2002, when the jury returned its verdict finding Tielsch guilty of third-degree murder.

Following his conviction at the fourth trial, Tielsch was sentenced, on November 13, 2002, to a term of imprisonment of ten to twenty years on the conviction for third-degree murder.

Commonwealth v. Tielsch, 934 A.2d 81, 83-84 (Pa. Super. 2007) (footnotes omitted).

The Superior Court of Pennsylvania affirmed Petitioner's judgement of sentence in a published opinion dated August 23, 2007, and denied his Application for Reargument on November 1, 2007. (Resp't Ex. 2, ECF No. 20-1, p.38); (Resp't Ex. 5, ECF No. 20-4, pp.1-39.) The Supreme Court of Pennsylvania denied Petitioner's Petition for Allowance of Appeal ("PAA") on May 30, 2008. (Pet's Ex. 6, ECF No. 20-4, pp.41-43.) Petitioner's direct appeal proceeding concluded when a Writ of Certiorari was denied by the Supreme Court of the United States on December 8, 2008. (Resp't Ex. 8, ECF No. 20-5, pp.1-2); (Res't Ex. 9, ECF No. 20-5, pp.3-40.)

On December 16, 2008, Petitioner filed a *pro se* Petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA") and the case was declared complex. (Pet'r Ex. T, ECF No. 1-24.) Petitioner was appointed an attorney and the trial court granted his request for the appointment of a private investigator. Through counsel, Petitioner filed an two Amended PCRA Petitions and two Supplements thereto ("PCRA petition"). (Pet's Exs. U, W, X, Y, Z, AA, ECF Nos. 1-25, 1-27, 1-28, 1-29, 1-30, 1-31.) The PCRA Petition was dismissed on November 16, 2012. (Resp't Ex. 1, ECF No. 20-1, p.35.)

Petitioner appealed the dismissal of his PCRA Petition and the Superior Court affirmed the dismissal in a Memorandum Opinion dated May 15, 2015. (Resp't. Exh. 15, ECF No. 20-9.) The Superior Court found that Petitioner's Brief did not comply with Rule 2119(a) of the Pennsylvania Rules of Appellate Procedure and also found several of the claims waived. Id. Reargument was denied on July 20, 2015, and no PAA was filed with the Pennsylvania Supreme Court.

Through counsel, Petitioner filed his Habeas Petition in this Court on May 10, 2016. (ECF No. 1.)  Respondents filed their Answer on September 15, 2016, and Petitioner filed a Response on October 1, 2017.  (ECF Nos. 20, 44.)

**B.**     **Standard of Review**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court may overturn a state court's resolution of the merits of a constitutional issue only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The phrase "clearly established Federal law," as the term is used in Section 2254(d)(1) is restricted "to the holdings, as opposed to the dicta of [the United States Supreme Court] decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 365 (2000).

If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de novo* evaluation of the constitutional claim on the merits.  *See* Tucker v. Superintendent Graterford SCI, 677 F. App'x 768, 776 (3d Cir. 2017) (citing Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the deference AEDPA otherwise requires.").  Indeed, the Third Circuit recently explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient.  That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," Williams, 529 U.S. at 389, 120 S.Ct. 1495. *See also* Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301

4

(2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard"). Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim *de novo* to evaluate if a constitutional violation occurred. *See* Lafler v. Cooper, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The AEDPA further provides for relief if an adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under § 2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding," which requires review of whether there was sufficient evidence to support the state court's factual findings. *See* Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Within this overarching standard, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, § 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004).

C. **Discussion**

Petitioner raises four claims in his Habeas Petition. First, Petitioner claims that he was denied his due process to present a defense by the exclusion of testimony from two proffered defense witnesses. Second, Petitioner claims that he was denied the effective assistance of

counsel because his counsel failed to argue, on direct appeal, that Musselwhite's statement was an excited utterance. Third, Petitioner alleges misconduct on the part of the prosecutor. Fourth, Petitioner alleges another claim of ineffective assistance of counsel for advising him not to testify at trial.

### 1.  Claim one

Petitioner first claims that the trial court's application of Pennsylvania's Rules of Evidence violated his due process right to present a defense when it ruled that the testimony of Charles Musselwhite ("Musselwhite") and Stephanie Maddich ("Maddich") was inadmissible. The following background is relevant to this claim.

### a.  Trial court[2]

On December 4, 2001, during Petitioner's second trial, Petitioner's trial counsel ("trial counsel") stated that he had received discovery of a detective's report dated April 23, 1986, indicating that Crime Stoppers had been contacted the day after the murder by a female who claimed that Musselwhite had called her frantic and upset at approximately two to three in the morning and "wanted to talk to somebody about the [shooting of Mr. Rosenblum]". N.T., Trial 2, 12/4/01, pp.1140-41. She said that Musselwhite told her that "he was a passenger in a car where his friend went beserk and shot a kid in Squirrel Hill." Id at p.1141. Trial counsel said that after relentless attempts to discover the identity of the female who called Crime Stoppers, he finally learned that her name was Stephanie Maddich, Musselwhite's ex-girlfriend who was married and residing in New Jersey at the time of the crime. Id. at pp.1141-42, 1144.

---

[2] Petitioner first sought to introduce this testimony during his second trial.

When asked to proffer the testimony of Maddich, trial counsel said that she would testify that she received a phone call from Musselwhite around two or three in the morning and he was very upset and crying. Id. at pp.1144-45. He told her that he was in the back seat of a car when the individual in the front seat shot some kid in Squirrel Hill. Id. at p.1145. He frantically asked her what he should do and Maddich told him to "call the police." Id. Maddich would also recall reading about the Rosenblum murder in the newspaper the following day and calling Crime Stoppers, whose number was listed in the story. Id. at p.1146. As to Musselwhite, who had consistently denied calling Maddich when he was questioned by detectives in the weeks following the murder, trial counsel proffered that on December 2, 2001, Musselwhite was interviewed by Detective Hitchings and admitted to calling Maddich a few days after the murder and telling her that "he did it."[3] Id. at pp.1142-43, 1156. However, Musselwhite claimed that he was drunk when he called her and only said that he did it "to impress her and make her believe he was a big guy on campus." Id. at p.1142.

The prosecutor objected to the proffered testimony as irrelevant, id. at pp.1146-48, and Judge O'Brien ("the trial court") questioned as to whether there was also a hearsay problem with the testimony, id. at p.1152. Trial counsel, however, argued that Musselwhite's statement to

_____

[3] Police investigators contacted Musselwhite on April 23, 1986, six days after the shooting; however, Musselwhite told the police that he had not been present at the time of the shooting. On May 13, 1986, police investigators again interviewed Musselwhite. This time, Musselwhite contradicted his earlier statement and told them that he had been present on the night of the murder and that he had seen another passenger in the vehicle shoot an individual whom he described as a rabbi or priest. The police discounted Musselwhite's statement, and the investigation continued without Musselwhite's participation; however, police investigators again contacted Musselwhite in December 2001, and Musselwhite, who was in California at the time, admitted to the police that he had in fact called Maddich and told her, falsely, that he had committed the shooting, but that he had done so only to impress her. This was the third different version provided by Musselwhite. (Resp't Ex. 5, ECF No. 20-4, p.13.)

Maddich was admissible as a statement against penal interest and as an excited utterance. Id. at pp.1154-55. Trial counsel also argued in the alternative that the statement was not hearsay because it was not being offered to prove the truth of the matter asserted, but rather lack of a proper investigation by the police. Id. at pp.1198-91.

After returning from a recess to review case law on the matter and receiving additional argument from the parties, id. at pp.1163-92, the trial court ruled that Musselwhite's statement was not an excited utterance because he said that he did it in order to impress Maddich, which, in his opinion, demonstrated deliberation. Id. at p.1194. The court also ruled that Musselwhite's statement was hearsay because it was being offered for the truth of the matter asserted, that another Musselwhite, and not Petitioner, had shot the victim, and that it did not meet the requirements for the statement against interest exception to the hearsay rule.[4] Id. at p.1195. Specifically, the rule required the declarant to be unavailable and the presence of corroborating circumstances that demonstrated the statement's trustworthiness. In this case, however, the declarant himself, Musselwhite, was the witness and he would testify that, not only was he drunk

---

[4] Pennsylvania Rule of Evidence 804(b)(3) provides that, if a declarant is unavailable, a statement against interest is not excluded by the rule against hearsay. The rule defines a statement against interest as one that:

(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa. R. Evid. 803(b)(3).

when he made the statement, but it was not true and he only said it to impress Maddich, who had a completely different recollection of the phone call.  Id. at pp.1195-98.  Despite trial counsel's argument that the admission of Musselwhite's statement was supported by Chambers v. Mississippi, 410 U.S. 284 (1973), the court concluded that, unlike the third-party confessions at issue in Chambers, it was not "made under circumstances showing trustworthiness," and, if admitted, could lead the jury to conclude that Musselwhite was the killer "based on absolutely almost zero evidence . . . except his own drunken statement to an old girlfriend in the middle of the night."  Id. at pp.1198-99.  The court also found that even if the statement was offered not to prove the truth of the matter asserted but to show that the police did not conduct a proper investigation, the prejudice of the statement would still greatly outweigh any probative value.  Id. at p.1199.

On May 13, 2002, just as the third trial was to begin, trial counsel made a request to put on the evidence from Maddich and Musselwhite saying, "It was very critical for the defense." N.T., Trial 3, 5/13/02, pp.29-36.  Trial counsel explained the prior ruling by Judge O'Brien and offered a "reproffer."  Id. at pp.31-35.  Counsel stated that he would put Musselwhite on the stand and ask him directly whether he was in the car when "a man was shot in Squirrel Hill" and "let him answer how he wants to answer" because any denial would be impeached by Maddich, whose testimony would be admissible as a prior inconsistent statement.  Id. at p.31.  The prosecutor contended that the information trial counsel just provided was the same as that presented to Judge O'Brien, id. at p.33, and Judge O'Toole stated that he could not change Judge O'Brien's earlier ruling on the issue.[5]  Id. at p.35.

---

[5] The Hon. W. Terrence O'Brien presided over the first and second trials while the Hon. Lawrence J. O'Toole presided over the third and fourth trials.

On August 30, 2002, prior to the fourth trial, the defense filed a petition to reconsider the order denying the defense's request to produce the testimony of Musselwhite and Maddich, and raised the issue again on September 3, 2002, just as the fourth trial began. N.T., Trial 4, 9/3/02, pp.43-46. The attempts to have the testimony admitted were unsuccessful.

### b. Direct appeal

On direct appeal, Petitioner claimed that he was denied his due process right to present a defense when the trial court prevented him from disclosing to the jury Musselwhite's statement to Maddich. In its Opinion filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the trial court stated the following:

> During the second trial in this matter, outside of the presence of the jury, there was a lengthy discussion between counsel and Judge O'Brien with regard to the defense request to present the testimony of Charles Musselwhite and Stephanie Maddich. Defense counsel made the following offers of proof: Mr. Musselwhite would testify that while drunk shortly [after] the shooting, he called his [ex]girlfriend and told her that he had done it; however, he was lying and he told her that he had committed the murder to impress her and be "the big man on campus". Ms. Maddich, who was living in New Jersey at the time, would testify that she received a telephone call from Mr. Musselwhite in the middle of the night and he was frantic. He told her that he was in the back seat of a car and his friend, who was in the front seat, went beserk and "shot some kid in Squirrel Hill". She told him to call the police and she called Crime Stoppers the next day after she heard news reports about the shooting of a rabbinical student in the Pittsburgh area. At the conclusion of the discussion, Judge O'Brien ruled as follows, which ruling is adopted herein: The testimony of Mr. Musselwhite was inadmissible hearsay because it was an out-of-court statement being introduced to prove the truth of the matter asserted and it did not fall into one of the exceptions to the hearsay rule. The testimony of Stephanie Maddich was inadmissible under the excited utterance exception to the hearsay rule because there was no independent corroboration from another source that Mr. Musselwhite actually witnessed the shooting that he claimed to have witnessed, which Judge O'Brien found to be required pursuant to Commonwealth v. Upshur, 764 A.2d 60 (Pa. Super. 69). (N.T. 11/26/01, pp. 1140-2101, 1429-1443).

(Resp't Ex. 3, ECF No. 20-1, pp.51-52.) Relying on Chambers v. Mississippi, 410 U.S. 284 (1973) and Green v. Georgia, 442 U.S. 95 (1979), Petitioner argued in his appellate brief that he

had a fundamental right to present testimony regarding the telephone call Maddich received from

Musselwhite and Musselwhite's statement that "he did it" even though some of the proffered

testimony was hearsay. (Resp't Ex. 4, ECF No. 20-3, pp.30-34.) In reviewing the claim, the

Superior Court summarized the unique factual circumstances presented in both <u>Chambers</u> and

<u>Green</u>, which led to the Supreme Court's holding that the mechanistic application of the hearsay

rule in both of those cases had denied the defendants their right to due process. *See* (Resp't Ex.

5, ECF No. 20-4, pp.15-17.) However, the Superior Court found that, unlike the situations

presented in <u>Chambers</u> and <u>Green</u>, "there were no *assurances of reliability* to buttress the out of

court statements" in Petitioner's case. (Resp't Ex. 5, ECF No. 20-4, p.17) (emphasis within).

The court went on to explain that

> . . . [u]nlike Tielsh's contention that the out of court statements would
> demonstrate that Musselwhite was the shooter, Maddich's proposed testimony
> was that Musselwhite had called her shortly after the murder to report that he had
> been present in the vehicle when the shooting had occurred, not that he had
> committed the murder himself. Furthermore, Musselwhite never confessed to the
> crime in any of the statements attributed to his conversations with the police. In
> his first interview with the police, he stated that he had not been present during
> the shooting. In his second interview, he stated that he had been present in the
> vehicle when another individual shot the 'rabbi or priest.' Finally, in 2001,
> Musselwhite admitted to the police that he had, in fact, called Maddich and told
> her that he was the shooter, but that he had been merely boasting to impress her.
> [FN13]. Given the different and contradictory statements attributable to
> Musselwhite, none of which consisted of a confession, we agree with the trial
> court that the proposed testimony presented a far different factual scenario than in
> <u>Chambers</u> or <u>Green</u>, and lacked the *assurances of reliability* as outlined by the
> United States Supreme Court.

> > [FN13] As noted, Maddich's proposed testimony differed from
> > Musselwhite's third statement to the police in that Maddich recalled
> > Musselwhite saying he was merely in the vehicle when another individual
> > shot the victim, not that Musselwhite was the shooter.

(Resp't Exh. 5, ECF No. 20-4, pp.17-18) (emphasis within).

### c. Clearly Established Federal Law

First, it is important to note that the Supreme Court has been "traditional[ly] reluctan[t] to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." Crane v. Kentucky, 476 U.S. 683, 689 (1986). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." United States v. Scheffer, 523 U.S. 303, 308 (1998). States have the power "to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability – even if the defendant would prefer to see that evidence admitted." Crane, 476 U.S. at 690 (citing Chambers, 410 U.S. at 302). This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane, 476 U.S. at 690 (quoting California v. Trombetta, 467 U.S. 479, 485 (1984) (citations omitted)). This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Scheffer, 523 U.S. at 308 (quoting Rock v. Arkansas, 483 U.S. 44, 58, 56 (1987)). The Supreme Court found that such a violation occurred in Chambers, supra.

In Chambers, the defendant was charged with murdering a police officer during an attack by a hostile crowd while officers attempted to execute an arrest warrant for a youth at a local bar and pool hall in Woodville, Mississippi. 410 U.S. at 285-86. At trial, Chambers attempted to show that not only did he not shoot the officer, but that another individual named Gable McDonald ("McDonald") had confessed to three acquaintances in independent private conversations, and to Chambers' attorneys, to whom he provided a sworn statement, that he was the one who shot the officer. Id. at 287-89. McDonald was called as a witness and his written

confession was read to the jury. Id. at 291. On cross-examination, however, McDonald testified

that he had repudiated his confession. Id. On re-direct, the trial court relied on Mississippi's

"voucher" rule in denying Chambers' request to treat McDonald as an adverse witness in order

to cross-examine him.[6] Id. at 291, 294. The trial court also determined that the testimony

regarding McDonald's confession to three of his acquaintances was inadmissible hearsay. Id. at

292-93.

After reviewing the trial court's evidentiary rulings, the Supreme Court found that the

declarations made by McDonald against his own penal interests were made "under circumstances

that provided considerable assurance of their reliability[,]" and concluded that Chambers' right

to due process had been violated by the court's "mechanistic" application of Mississippi's rules

of evidence. Id. at 300, 302. Specifically, the Supreme Court identified three circumstances

under which McDonald had made the statements against his penal interest that provided

assurance of their reliability.

> . . . . First, each of McDonald's confessions was made spontaneously to a close
> acquaintance shortly after the murder had occurred. Second, each one was
> corroborated by some other evidence in the case – McDonald's sworn confession,
> the testimony of an eyewitness to the shooting, the testimony that McDonald was
> seen with a gun immediately after the shooting, and proof of his prior ownership
> of a .22-calliber revolver and subsequent purchase of a new weapon. The sheer
> number of independent confessions provided additional corroboration for each.
> Third, whatever may be the parameters of the penal-interest rationale, each
> confession here was in a very real sense self-incriminatory and unquestionably
> against interest. McDonald stood to benefit nothing by disclosing his role in the
> shooting to any of his three friends and he must have been aware of the possibility
> that disclosure would lead to criminal prosecution. Indeed, after telling Turner of
> his involvement, he subsequently urged Turner not to 'mess him up.'

---

[6] The "voucher" rule is a Mississippi common-law rule that prohibited a party from impeaching
his own witness. See id. at 295-96.

Id. at 300-01 (internal footnotes and citations omitted).  The Supreme Court, however, took care to limit the breadth of its holding stating that it "establish[ed] no new principles of constitutional law . . . .  Rather, we hold quite simply that under the facts and circumstances of this case, the rulings of the trial court deprived Chambers of a fair trial."  Id. at 302-03.

Since its decision in Chambers, the Supreme Court has reaffirmed the principles set forth therein on a number of occasions.  For example, in Green, another case relied on by Petitioner, the Supreme Court vacated a death sentence because the trial court refused to admit testimony that someone other than the defendant fired the shots that killed the victim.  It found the excluded testimony "highly relevant" and "substantial reasons existed to assume its reliability."  442 U.S. at 97.  Specifically, the statements were made "spontaneously to a close friend[,]" "[t]he evidence corroborating the confession was ample," "[t]he statement was against interest, and there was no reason to believe that [petitioner's co-defendant] had any ulterior motive in making it."  Id.

### d.  Review under AEDPA

Petitioner has identified the correct clearly established federal law governing the issue in this claim and he argues that the Superior Court's decision was "contrary to" and an "unreasonable application of" that law, which, he claims, mandated that Musselwhite's testimony be admitted.

The Supreme Court has identified two scenarios where a state court decision will fall into section 2254(d)(1)'s "contrary to" clause.  First, a state court decision will be "contrary to" clearly established federal law when the court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  It identified

the following example where a state court decision on an ineffective assistance of counsel claim would be "contrary to" <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in <u>Strickland</u> that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'

<u>Williams</u>, 529 U.S. at 405-06 (internal citations omitted). However, a state court decision is not "contrary to" <u>Strickland</u> just because it's decision may be "contrary to the federal court's conception of how <u>Strickland</u> ought to be applied in that particular case" as that would "sap the 'unreasonable application' clause of any meaning." <u>Id</u>. at 406-07. The Supreme Court said that a state court decision will also be "contrary to" clearly established federal law if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." <u>Id</u>. at 406.

Here, it is abundantly clear that the Superior Court's decision in this case was not "contrary to" clearly established federal law because it identified both <u>Chambers</u> and <u>Green</u>, as did the trial court, and applied the appropriate governing law. Moreover, despite Petitioner's argument otherwise, the Superior Court's decision cannot be described as "contrary to" clearly established federal law because the facts of his case are not "materially indistinguishable" from <u>Chambers</u> or any other Supreme Court decision. As such, the pivotal question becomes whether the Superior Court's application of clearly established federal law was unreasonable.

Under the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1), "a federal habeas court may not grant relief simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

15

incorrectly.  Rather, that application must also be unreasonable."  <u>Williams</u>, 529 U.S. at 411.

The Supreme Court later expanded on this interpretation of the "unreasonable application" clause

explaining that the state court's decision must be "objectively unreasonable," not merely wrong;

even "clear error" will not suffice.  <u>Locklyer v. Andrade</u>, 538 U.S. 63, 75 (2003).  "As a

condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

state court's ruling on the claim being presented in federal court was so lacking in justification

that there was an error well understood and comprehended in existing law beyond any possibility

for fairminded disagreement."  <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011).

To have been entitled to relief by the Pennsylvania Superior Court, Petitioner had to

show that the trial court's application of the hearsay rule, and subsequent evidentiary ruling on

the admissibility of Musselwhite and Maddich's proposed testimony, denied him his

fundamental right to present a defense such that the trial court abused its discretion when it ruled

the proffered testimony inadmissible.  In reviewing the claim, the Superior Court set forth the

governing law with respect to third party confessions and evidentiary rulings and identified the

legal principles set forth by the Supreme Court in <u>Chambers</u> and <u>Green</u>, namely that the Due

Process Clause affords criminal defendants the right to introduce into evidence third parties'

declarations against penal interest when the circumstances surrounding the statements provide

consideration assurance of their reliability.  In applying this rule, the Superior Court agreed that,

unlike the unique circumstances presented in <u>Chambers</u> and <u>Green</u>, the proposed testimony in

Petitioner's case lacked the assurances of reliability as outlined in those cases.  It noted that

Musselwhite had given a number of different and contradictory statements none of which

consisted of a confession.  He never actually confessed to the crime in any of his statements to

the police and Maddich would testify that Musselwhite called her on the night of the murder and

16

told her that he had been present in the vehicle when someone else shot the victim, not that he had shot the victim.

Petitioner argues that the Superior Court unreasonably applied <u>Chambers</u> by "nitpicking" subtle and inconsequential differences between the Musselwhite evidence and that excluded by the state court in <u>Chambers</u>. However, unlike the multiple confessions made by McDonald in <u>Chambers</u>, Musselwhite's "confession" was not made under similar circumstances that provided considerable assurance of its reliability. Musselwhite's *confession*, as opposed to his *conversation* with Maddich, could not be corroborated by either Maddich, who did not recall Musselwhite telling her that he was the shooter, or the police who interviewed him in December 2001, to whom Musselwhite did not actually confess. Additionally, there was no other evidence of guilt or confession made by Musselwhite proffered by the defense. Moreover, in <u>Chambers</u>, McDonald stood to benefit nothing by confessing to the murder while Musselwhite was drunk when he made the statement and admitted to making it solely to impress his ex-girlfriend. The Court acknowledges Petitioner's strong disagreement with the Superior Court's assessment of the reliability of Musselwhite's statements to Maddich, points of contention that are not wholly without merit;[7] and while it is possible to put forth a viable argument that the trial court erred in

---

[7] In support of his position that the trial court's application of the hearsay rule, denied him his due process right to present a defense, Petitioner relies heavily on Judge Bowes' dissent in his direct appeal. Judge Bowes disagreed with the majority and believed that Musselwhite's frantic phone call to Maddich on the night of the murder had "earmarks of reliability." Specifically, he was frantic and upset when he made the call, it was made to a close friend, there was no reason for him to fabricate that he had witnessed the murder and he sought her advice about what to do. Moreover, she believed that there could be no question as to whether Musselwhite actually witnessed the murder because he provided details to Maddich that had not yet been disseminated to the public. For example, Musselwhite told Maddich that the shooting happened in Squirrel Hill and the victim was a religious figure. Finally, Petitioner argues that the very fact that Musselwhite eventually admitted to police to calling Maddich, something that was substantiated by Maddich's telephone records, further established the reliability of his proffered testimony.

ruling the testimony inadmissible, it cannot be said that the state court's decision was the result of an objectively unreasonable application of clearly established federal law.

Finally, Petitioner argues that, at a minimum, the Superior Court's decision was based on an unreasonable determination of the facts in light of the evidence presented. However, there were no factual findings made by the state court which were used to support the state court's decision and Petitioner does not identify any in his Habeas Petition. As Petitioner has not overcome AEDPA's deferential standard of review under either sections 2254(d)(1) or (2), he is not entitled to relief on this claim.

### 2. **Claim two**

Petitioner next argues that his appellate counsel was ineffective for failing to raise, on direct appeal, a claim that Musselwhite's statement to Maddich should have been admissible as an excited utterance. Petitioner presented this issue as claim 43 in his *pro se* PCRA petition, and his PCRA appellate counsel raised it as claim 25 in Petitioner's appellate brief.[8] (Pet'r Ex. FF, ECF No. 1-36, pp.84-88.) However, the Superior Court found the claim waived because Petitioner failed to cite any pertinent legal authority to support it as required by Pennsylvania Rule of Appellate Procedure 2119(a). (Resp't Ex. 15, ECF No. 20-9, p.18.) Given the Superior Court's finding, Respondents maintain that this claim is procedurally defaulted and must be dismissed because Petitioner has failed to plead and prove cause and prejudice or a fundamental miscarriage of justice in order to overcome the default.

---

[8] At this time, the Court notes that Petitioner's current counsel, Robert E. Mielnicki, also represented Petitioner in his PCRA appeal proceedings after Petitioner's relationship with his initial PCRA attorney, Patrick Kenneth Nightingale, disintegrated. *See* Resp't Ex. 15, ECF No. 20-9, pp.3-4.

A federal court may not grant a writ of habeas corpus unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To exhaust, "the petitioner must fairly present all federal claims to the highest state court before bringing them in federal court." Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007) (citation and internal quotation marks omitted). Nonetheless, even when a petitioner brings a claim in state court, a federal court ordinarily may not review it on the merits if the state court's denial of relief is based on a procedural default that rests on a state law ground that is independent of the federal question and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729 (1991). State procedural rules have been held to be inadequate if they are not "firmly established and regularly followed," Ford v. Georgia, 498 U.S. 411, 424 (1991), or if they are "novel [ ]" and unforeseeable. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 457 (1958); *see also* Ford, 498 U.S. at 424.

In finding the issue waived on appeal, the Superior Court relied on Petitioner's failure to comply with Pa. R.A.P. 2119(a), which requires that a party's "argument shall have . . . discussion and citation of authorities as are deemed pertinent." Rule 2119(a) is an independent and adequate state law ground precluding federal habeas review, *see* Xavier v. Superintendent Albion SCI, 689 F. App'x 686, 689 (3d Cir. 2017), and as a result of failing to comply with the Rule, this claim is barred from consideration unless Petitioner can prove that an exception to the default applies.

A petitioner may obtain federal review of a procedurally defaulted claim if he can demonstrate cause for the default and prejudice arising from the violation of federal law, or that the failure to consider the claim would result in a fundamental miscarriage of justice. Petitioner

has not argued, much less demonstrated, cause and prejudice or a fundamental miscarriage of justice. Accordingly, this claim is barred from review.[9]

### 3. **Claim three**

In claim three, Petitioner alleges two instances of prosecutorial misconduct "so egregious" that the appropriate remedy should have been dismissal. In the first of these instances, Petitioner claims that the prosecutor "introduced a forged or otherwise fake document, on the first trial, purportedly from the Pennsylvania Department of Transportation [("PennDOT"] arguing that such showed Petitioner destroyed the vehicle, a Corvette, allegedly used in the murder." (ECF No. 1, p.7.) In the second of these instances, Petitioner claims that the prosecutor permitted Michael Starr ("Starr"), a Commonwealth witness, to testify that he received no benefit for his testimony. These claims of prosecutorial misconduct were raised on direct appeal as one of trial court error in denying the defense's motion to dismiss that argued retrial was barred by the double jeopardy clause of the Pennsylvania Constitution as interpreted by the Pennsylvania Supreme Court in <u>Commonwealth v. Smith</u>, 615 A.2d 321, 325 (Pa. 1992), which held that the double jeopardy clause of the Pennsylvania Constitution bars retrial when the Commonwealth specifically undertakes to prejudice the defendant to the point of denying him a fair trial. (Resp't Ex. 5, ECF No. 20-4, p.4.) Petitioner also raised a claim in his PCRA petition and subsequent appeal that appellate counsel was ineffective for failing to raise trial counsel's

---

[9] In addition, Petitioner cannot demonstrate prejudice for appellate counsel's failure to raise this claim on appeal because the Superior Court actually found that the trial court did not abuse its discretion when it ruled to exclude Musselwhite's statement despite counsel's failure to argue that Maddich's statement should have been admissible as an excited utterance. (Resp't Ex. 5, ECF No. 20-4, p.14.) For substantially the same reasons set forth in claim one, and to the extend that this claim can be deemed exhausted, the Superior Court's decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.

ineffectiveness for failing to properly litigate the issue of prosecutorial misconduct regarding the PennDot issue.[10]  (Resp't Ex. 15, ECF No. 20-9, pp.15-17.)

Although Petitioner claimed on appeal that these two instances of Commonwealth misconduct invoked the double jeopardy clause of the Pennsylvania Constitution, Respondents do not argue that the underlying federal law claim of prosecutorial misconduct was not properly exhausted in state court.[11]  *See* McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) (exhaustion requires that the petitioner "fairly present" the federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted).  Therefore, this claim will be reviewed according to the standards set forth in 28 U.S.C. § 2254(d).

With respect to the first instance of claimed prosecutorial misconduct, Petitioner states that the prosecutor falsely argued that records from PennDOT showed that Petitioner destroyed his Corvette following the murder.  This evidence, introduced as Commonwealth Exhibit 31, was

---

[10] Petitioner filed is direct appeal on December 12, 2002, just before the Pennsylvania Supreme Court's decision in Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002), which held that as a general rule claims on ineffective assistance of counsel should be deferred until collateral review. "Pursuant to the PCRA, once his counsel on direct appeal failed to raise the issue of trial counsel's ineffectiveness, any claim of trial counsel's ineffectiveness was waived."  (Resp't Ex. 15, ECF No. 20-9, p.7) (citing Commonwealth v. McGill, 832 A.2d 1014, 1021 (Pa. 2003). Therefore, the only claim of counsel ineffectiveness Petitioner could have raised in his PCRA petition was that of appellate counsel's ineffectiveness for failing to raise a claim of trial counsel ineffectiveness.  Id.

[11] In Commonwealth v. Smith, 615 A.2d 321 (Pa. 1992), the case relied on by Petitioner for this claim in his direct appeal, the facts concerned Commonwealth tactics that in the Pennsylvania Supreme Court's opinion "were clearly in violation of the rule of Brady v. Maryland, 373 U.S. 83 (1965), and, if proved, would, at the very least, entitle appellant to a new trial pursuant to Brady."  615 A.2d at 322.  The question in Smith, however, was not whether there was a violation of Brady, but rather whether the double jeopardy clause of the Pennsylvania Constitution prohibited retrial of appellant based on the prosecutor's misconduct.

a certified copy of the title history of a 1977 Corvette, which indicated that the vehicle had been first titled in Pennsylvania on May 5, 1977, and registered to Petitioner, and that the registration had expired on April 30, 1986. (Pet'r Ex. M, ECF No. 1-17.) In his appellate brief, Petitioner argued that his uncle, Francis C. Tielsch, never owned the Corvette and that he did not have it salvaged. He noted that in order for his uncle to have done so, he would have had to put the title for the Corvette into his uncle's name or a salvor's name, yet the prosecutor argued at the first trial that title to the Corvette remained in Petitioner's name from the first day he owned it. Based simply on what the prosecutor argued to the jury about the title of the Corvette, Petitioner argues that it was evident that the prosecutor knew his argument about Petitioner having the Corvette salvaged was false and intended to provoke the defense into moving for a mistrial. (Pet'r Ex. O, ECF No. 1-19 at pp.84-85, 88.)

In denying this claim, the Superior Court set forth the following facts and analysis.

…. During the Commonwealth's closing argument, the prosecutor told the jury that Exhibit 31 indicated that Tielsch's uncle, Francis Tielsch, an insurance agent, had the Corvette destroyed in 1998, thus evidencing actions taken to hide Tielsch's guilt. In so informing the jury, the prosecutor relied not on the actual exhibit, but a loose-leaf copy from a detective's file. It turned out that the page the prosecutor relied on was from another unrelated report. The prosecutor accordingly admitted his error after the mistake was discovered.

After Tielsch's motion for a mistrial was denied, the trial court appropriately provided a curative instruction to the jury telling them that "the parties agree that the insurance claim referred on that page of Exhibit 31 was actually made by Francis T. Tielsch on a Chrysler automobile" and to disregard the Commonwealth's comment that Tielsch's uncle had disposed of the vehicle.

As Tielsch acknowledges in his brief, the prosecutor "claimed that he made an honest mistake due to confusion by a missing page in Exhibit 31." Tielsch maintains, however, that the aforementioned conduct requires a new trial "as an experienced prosecutor . . . knows" that the Vehicle Code requires that "the defendant would have had to put the title for the Corvette into his uncle's name or a salvor's name," in order for Tielsch's uncle to have arranged for the car to be destroyed. Tielsch also notes that Francis Tielsch had been contacted by police

22

investigators two times before the prosecutor made his final argument and had informed the police that he had not made a claim, nor had any claim been filed through his agency, for the Corvette. In addition, Tielsch contends that the veteran prosecutor "knew *or should have known* that he could not utilize the loose leaf papers from a detective's file . . . ."

The record simply does not support Tielsch's contention that the Commonwealth acted *intentionally* in describing Exhibit 31 to prejudice Tielsch. *See* Smith, 615 A.2d at 325 (holding that the double jeopardy clause bars retrial when the Commonwealth "intentionally undertake[s] to prejudice the defendant to the point of the denial of a fair trial."). Although the prosecutor was mistaken in his assertion, there is absolutely no evidence of a deliberate misstatement. Tielsch's unsupported theory is insufficient to show a deliberate trial tactic adopted by the prosecutor. As such, Tielsch's claim fails. *See*, *e.g.*, Commonwealth v. Simmons, 662 A.2d 621, 639 (Pa. 1995) (finding no prosecutorial misconduct where evidence did not show that misstatement of fact was deliberate); Commonwealth v. Brown, 414 A.2d 70, 77 (Pa. 1980) (misstatement of fact by prosecutor in closing did not constitute error or warrant a new trial because evidence did not show that misstatement was deliberately done). Because we find no suggestion that the Commonwealth deliberately undertook trial strategies to prejudice Tielsch, we cannot conclude that any double jeopardy violation occurred in this regard.

(Res't Ex. 5, ECF No. 20-4, pp.6-8) (emphasis within) (footnotes and internal citations to record omitted).

The second instance of prosecutorial misconduct asserted by Petitioner involves Commonwealth witness Michael Starr ("Starr") who testified at Petitioner's first and second trials that he did not receive any promise of leniency in his federal prosecution in exchange for his testimony against Petitioner. Petitioner claims that the prosecutor committed intentional misconduct by permitting Starr to testify that he received nothing from his testimony despite, at the first trial, having a sentence reduction pending in Federal Court.[12]

---

[12] At trial, Starr noted that he had signed a plea agreement in federal court wherein he had agreed to testify against others in exchange for the government's commitment to review his actions and accordingly recommend a sentence reduction if appropriate. Starr also testified that as of the date of his testimony against Petitioner he was still awaiting the hearing on his request for

Petitioner raised this claim on appeal and Judge O'Toole, in his Pa. R.A.P. 1925(a)

Opinion, addressed the claim as follows.

> .... Mr. Starr began cooperating with the federal authorities in 1997, shortly after his arrest on federal narcotics charges – years before the Defendant herein was arrested. Mr. Starr, in conjunction with his lawyer, negotiated and executed a plea agreement with the government in mid-1998, which included specific details as to his cooperation and what the government would do in exchange for his cooperation, none of which had anything to do with this case. Mr. Starr then went to federal prison to begin serving his sentence, during which time he continued to provide the federal authorities with information about other cases and narcotics trafficking. In early 2001, Mr. Starr contacted the warden at the institution indicating that he had some information on a pending homicide prosecution. Eventually, the warden put Mr. Starr in touch with the prosecutor in this case, who spoke with him by telephone and then arranged for him to be transported to the Allegheny County Courthouse to testify. After Mr. Starr's testimony in the first trial, the prosecutor appeared at a hearing in federal court to confirm that Mr. Starr had willingly testified about an incident involving the Defendant, wherein the Defendant made a reference to killing a Jewish man. This testimony by the prosecutor in Mr. Starr's federal re-sentencing hearing was peripheral, at best. It was not part of his plea agreement with the federal government, nor was it part of the Motion filed on his behalf requesting a reduction in his sentence. Accordingly, the Court finds no prosecutorial misconduct in this regard and no basis for a new trial.

(Resp't Ex. 3, ECF No. 20-1, pp.53-54.)

> In his appellate brief, Petitioner maintained that the prosecutor
>
> had to know that in just a few weeks Starr would be using the fact that he testified in the Tielsch homicide to gain a sentence reduction in federal court, including having prosecutor Fitzsimmons himself testify on his behalf. Instead of allowing the jury to hear Starr's expectation of what he had to gain, Fitzsimmons permitted Starr to deny any benefit, alerting no one.

(Resp't Ex. 5, ECF No. 20-4, p.9.) The Superior Court noted that "courts have long recognized

the responsibility of the prosecution to disclose a promise of leniency that is made to a witness to

motivate testimony against an accused." Id. at p.10. The court cited Brady v. Maryland, 373

---

reduction of sentence. Starr repeatedly denied, even during vigorous cross-examination, that his testimony against Petitioner was related in any way to his plea agreement.

U.S. 83 (1963), wherein the United States Supreme Court held that a defendant's right to due process is violated when the prosecution withholds favorable evidence, which, in addition to evidence reflecting on the defendant's culpability, "also includes evidence of an impeachment nature that is material to the case against the accused." Id. (quoting Commonwealth v. Strong, 761 A.2d 1167, 1171 (Pa. 2000)). It also noted that in Pennsylvania, "any implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility, and therefore constitutes Brady material." Id. (citing Commonwealth v. Champney, 832 A.2d 403, 412 (Pa. 2003). In finding no violation, the Superior Court stated that

> [w]hen we compare the disclosure made by the Commonwealth in this case with the facts supporting the [Pennsylvania] Supreme Court's finding of a Brady violation in Strong, we are compelled to agree with the trial court that no relief is due Tielsch. In Strong, unbeknown to the defense, the witness' counsel had been in active negotiations with the Commonwealth, all prior to the trial. In the case before us, we can find nothing in the record which indicates that the Commonwealth withheld any information about Starr's sentencing negotiations from Tielsch. Tielsch's trial counsel was provided with Starr's plea agreement and sentence, as well as the motion from his federal prosecution to reduce the sentence in light of Starr's cooperation in other cases. As a result of the disclosure, Tielsch's trial counsel vigorously cross-examined Starr regarding any possible motivation for his testimony in relation to the motion for a reduced sentence and later argued to the jury that they should reject Starr's testimony because of this perceived inducement. Tielsch's mere allegation that the assistant district attorney had promised to assist in Starr's efforts to gain a reduction in his federal sentence is not sufficient to establish that such an agreement in fact existed either before or at the time of trial. For example, in Commonwealth v. Morales, 701 A.2d 516, 522-23 (1997), under similar circumstances, our Supreme Court stated: "[W]e decline to find that a Brady violation occurred since appellant offers nothing besides his mere conjecture that such an arrangement existed."

> The Commonwealth was under no obligation to postulate alternative motivations for Starr's testimony. Based upon the disclosure by the Commonwealth, Tielsch's trial counsel meticulously cross-examined Starr with respect to the details of his plea agreement and his motivation for testifying. Therefore, the record supports no finding of prosecutorial misconduct in this respect.

Id. at pp.11-12.

The United States Supreme Court has held that prosecutorial misconduct may "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). For a due process violation to occur, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 483 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985) (internal quotations omitted).

While Petitioner claims that the Superior Court misunderstood or oversimplified the actual argument that he presented, the Superior Court did not find prosecutorial misconduct in either of the two instances alleged by Petitioner and its decision was neither "contrary to" nor "an unreasonable application of" clearly established federal law. Thus, the state court's decision will not be disturbed.

Petitioner appears to argue in the alternative that he should be granted an evidentiary hearing on his claims of prosecutorial misconduct because he was never permitted one by the state courts in order to develop his claims. In this regard, the Supreme Court, in Cullen v. Pinholster, 563 U.S. 170 (2011), imposed strict limitations on when a federal court sitting in habeas can hold an evidentiary hearing to supplement the record before the state court. It held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Id. at 181. Thus, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petition[er] must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Id. at 185. In addition, review of a claim under § 2254(d)(2) is specifically limited to "evidence presented in the State court proceeding." 28

U.S.C. § 2254(d)(2).  The Third Circuit has held that, as a general rule, "district courts cannot conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d)."  Brown v. Wenerowicz, 663 F.3d 619, 629 (3d Cir. 2011) (finding Pinholster controlling and holding that the district court erred in conducting an evidentiary hearing).

An evidentiary hearing may be held under AEDPA if (a) the petitioner's allegations state a *prima facie* claim for habeas relief and are not conclusory or contradicted by the record, and (b) the hearing is neither excluded by § 2254(e)(2), nor impermissibly expands the state court record.  Moore v. Secretary Pennsylvania Dept. of Corrections, 457 F. App'x 170, 176 (3d Cir. 2012) (citing Palmer v. Hendricks, 592 F.3d 386, 392-93 (3d Cir. 2010) and Pinholster, 131 S. Ct. at 1398-1400).  Given that the Superior Court reviewed both of Petitioner's claims of prosecutorial misconduct on their merits, and found none that warranted relief, granting Petitioner an evidentiary hearing would effectively expand the state court record and violate the Supreme Court's express holding in Pinholster.  Therefore, his request for a hearing is denied.

### 4.  **Claim four**

Petitioner's final claim is that his trial counsel for his fourth trial rendered ineffective assistance when he advised Petitioner not to testify on his own behalf.  Petitioner claims that the advice was unreasonable because the reasoning behind it was faulty.  Specifically, he claims that his attorney advised him not to testify so as to not "open the door" to his prior narcotics arrest[13]

---

[13] A federal indictment was filed against Petitioner on November 14, 2000.  *See* United States v. Tielsch, No. 00-cr-196 (W.D. Pa. Nov. 14, 2000) (ECF No. 3).  The indictment stemmed from drugs that were discovered during the execution of a state search of Petitioner's home on February 17, 2000, following which he was arrested and charged with the murder of the victim in this case.  Id. at ECF No. 62, p.1.  Almost two weeks after Petitioner was found guilty of third-degree murder, the government filed a superseding indictment charging Petitioner with conspiracy to distribute and possession with intent to distribute cocaine (Count 1), distribution of cocaine (Count 2), distribution of marijuana (Count 3) and possession with intent to distribute

and his conviction for the involuntary manslaughter of Kevin Ohm. However, the jury was informed of his criminal history and aware that Ohm was dead.

The Pennsylvania Superior Court analyzed Petitioner's claims of ineffective assistance of counsel utilizing the standard set forth in <u>Commonwealth v. Pierce</u>, 527 A.2d 973 (Pa. 1987). (Resp't Ex. 15, ECF No. 20-9, pp.7-8.)  The Third Circuit Court of Appeals has ruled that the <u>Pierce</u> standard is not "contrary to" <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the standard enunciated by the United States Supreme Court in judging ineffectiveness claims, and, therefore, the state court's adjudication in this case satisfied review under the "contrary to" clause of § 2254(d)(1).  *See* <u>Wertz v. Vaughn</u>, 228 F.3d 178, 204 (3d Cir. 2000).  As such, the question becomes whether the Superior Court's decision was an objectively unreasonable application of this law.

This Court has summarized the law with regard to whether trial counsel was ineffective in the advice given to a defendant relevant to his testimony at trial as follows:

> A criminal defendant has a constitutional right to testify on his own behalf, a right which may only be waived by the defendant.  <u>Rock v. Arkansas</u>, 483 U.S. 44, 50-53 (1987); <u>United States v. Pennycooke</u>, 65 F.3d 9, 10 (3d Cir. 1995).  Because the right to testify finds its foundation in the Constitution and the mandates of Due Process, a defendant's waiver of that right must be voluntary, knowing and intelligent.  <u>Pennycooke</u>, 65 F.3d at 11.  The duty of providing such advice on whether to testify and ensuring that any waiver is knowing and intelligent rests with defense counsel.  <u>Id</u>. at 12.  A presumption remains, however, that where a defendant is represented by counsel, counsel has presumably discussed the defendant's right to testify with him, and defendant voluntarily and intelligently waived that right.  *See* <u>United States v. Hatcher</u>, No. 94-173-1, 1997 WL 698488,

---

marijuana (Count 4).  Pursuant to a written plea agreement, Petitioner plead guilty to Count 1 of the superseding indictment and was sentenced to 216 months' imprisonment to run concurrently with his state sentence.  <u>Id</u>.  Prior to this, Petitioner had twice been convicted of federal drug trafficking offenses.  *See* <u>United States v. Tielsch</u>, 875 F.2d 312 (3d Cir. 1989) (Table) and <u>United States v. Tielsch</u>, 39 F.3d 1173 (3d Cir. 1994) (Table).  He was also found guilty for the 1991 death of Kevin Ohm after Petitioner drove his car into a tree while drunk.  *See* <u>Commonwealth v. Tielsch</u>, CP-02-CR-0015730-1991 (Allegheny Cty. Com. Pleas Ct.).

at *3 (E.D. Pa. Nov. 7, 1997) (citing Pennycooke, 65 F.3d at 12-13.)
Consequently, to succeed on a claim of ineffective assistance for failure to allow a
defendant to testify, the petitioner must overcome these presumptions. Id.
Moreover, in order to demonstrate prejudice for a claim of ineffective assistance
for failure to allow a defendant to testify, a petitioner must put forth more than a
"bald assertion" that he was not allowed to testify, including some specifics as to
what his testimony would have been. Palmer v. Hendricks, 592 F.3d 386, 399 (3d
Cir. 2010) (holding that petitioner's mere stated desire to tell his side of the story
"falls far short of satisfying Strickland's prejudice element.").

Glenn v. Wynder, No. 06-513, 2012 WL 4107827, at *40 (W.D. Pa. Sept. 19, 2012).

While the reasons for trial counsel advising Petitioner not to testify are not found in the

record, the Superior Court did determine that Petitioner knowingly, intelligently and voluntarily

waived his right to testify on his own behalf and concluded that, even if Petitioner's explanation

was true as to why his trial counsel advised him not to testify, counsel's advice was reasonable.

(Resp't Ex. 15, ECF No. 20-9, p.14.)

The oral colloquy at trial clearly demonstrates that Petitioner understood that he was

waiving his right to testify and did so intelligently and voluntarily. N.T., Trial 4, 9/9/02, at 945-

46. Furthermore, he did so after having heard the evidence against him not just once, but four

times, and having waived his right to testify on three prior occasions, including his first trial at

which he was represented by different counsel.

Moreover, despite Petitioner's claim that counsel's advice was faulty because the jury

was already aware that Kevin Ohm was dead, Petitioner fails to recognize that the jury was not

made aware of the circumstances of Ohm's death, including Petitioner's involvement in it.

Petitioner's other claim that counsel's advice was also faulty because the jury was already aware

of his criminal history is somewhat misleading. While it was clear that Petitioner had been

incarcerated at various times in his personal history, the jury was not made aware of the factual

circumstances that lead to those sentences.

29

Not only has Petitioner not overcome the presumption that he knowingly and intelligently waived his right to testify, he has not shown that the Superior Court unreasonably applied the ineffectiveness standard such that its decision cannot be reasonably justified under <u>Strickland</u>. As such, Petitioner has not overcome the AEDPA's highly deferential standard in order for habeas relief to be granted and his request for an evidentiary hearing on this claim is denied for the same reasons stated with regard to claim three, *infra*.

**D.      Certificate of Appealability**

A court should issue a certificate of appealability where a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner meets this burden by showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). A certificate of appealability will be denied in this case because jurists of reason would not disagree with the Court's resolution of Petitioner's claims or conclude that they are "adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003) (citing <u>Slack</u>, 529 U.S. at 484). A separate Order will issue.

Dated: September 25, 2019.

Lisa Pupo Lenihan
United States Magistrate Judge


Cc:      Counsel of Record
           (*via CM/ECF electronic mail*)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN MICHAEL TIELSCH, | ) | |
| | ) | Civil Action No. 16 – 594 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| MARK CAPOZZA, THE | ) | |
| ATTORNEY GENERAL OF THE | ) | |
| STATE OF PENNSYLVANIA and | ) | |
| THE DISTRICT ATTORNEY OF | ) | |
| ALLEGHENY COUNTY, | ) | |
| | ) | |
| Respondents. | ) | |

## **ORDER**

**AND NOW**, this 25th day of September, 2019;

**IT IS HEREBY ORDERED** that the Petition for Writ of Habeas Corpus (ECF No. 1) is denied as is Petitioner's request for an evidentiary hearing.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is denied.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Respondents and mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
United States Magistrate Judge